**NUVEEN PREMIUM INCOME MUNICIPAL FUND 4, INC. and Strong Municipal Bond Fund, Inc., Plaintiffs,**

v.

**MORGAN KEEGAN & COMPANY, INC., and T. Kenny & Company, Inc., Defendants.**

**No. Civ–00–935–HE.**

United States District Court, W.D. Oklahoma.

March 8, 2002.

Order on Reconsideration April 19, 2002.

Rodney J Heggy, Bruce W Day, Robert
S Baker, Day Edwards Federman Propes-

ter & Christensen, John R. Morris, James C McMillin, McAfee & Taft, Oklahoma City, OK, Gary J Ceriani, Michael P Cillo, Valeri Susan Pappas, Davis & Ceriani PC, Denver, CO, for plaintiffs.

Robert B Gilbreath, Shepherd D Tate, Michael A Brady, Tate Lazarini & Beall PLC, Memphis, TN, Will S Montgomery, Jenkins & Gilchrist, Dallas, TX, William B Federman, Stuart W Emmons, Federman & Sherwood, Oklahoma City, OK, Thomas B Walsh, IV, Fish & Richardson PC, Dallas, TX, Nathaniel L Prosser, Morgan Keegan & Company Inc, Memphis, TN, Russell A Cook, J William Conger, Ryan S Wilson, Hartzog Conger Cason & Neville, Oklahoma City, OK, Daniel M. Noland, Steven P. Gomberg, Rooks Pitts & Poust, Chicago, IL, for defendants.

Clell I Cunningham, III, Dunn Swan & Cunningham, Oklahoma City, OK, for Isaacs & Associates.

R Pope Van Cleef, Jr, Robertson & Williams, Oklahoma City, OK, for RCS & Associates.

Keith A Ward, Richardson & Ward, Tulsa, OK, for Capital Assets Inc.

June L Chubbuck, Chubbuck Smith Rhodes Stewart & Elder, Oklahoma City, OK, for Atlas Management Services Inc.

W Steven Walker, Irving, TX, for Trinity Foundation Inc.

*ORDER*

HEATON, District Judge.

Plaintiffs instituted this action for damages against Defendants for alleged fraud, negligent misrepresentations, fraudulent non-disclosure and violations of 71 Okla. Stat. § 408, stemming from the sale of certain municipal bonds issued in Oklahoma. Defendant Morgan Keegan & Company, Inc. (hereinafter "Morgan Keegan") filed a motion to determine applicable law, a motion for summary judgment with regard to its alleged status as an underwriter in the securities transactions at issue and a motion for summary judgment with regard to alleged misrepresentations. The Plaintiffs have responded to all of the motions and filed a cross-motion for summary judgment on defendant Morgan Keegan's alleged status as an underwriter. The court held a hearing on these motions on February 27, 2002. After hearing oral arguments on the issues presented in the motions, the court orally denied the motions. This order sets forth the reasons for the court's decisions.[1]

■ In its motion to determine applicable law, Morgan Keegan seeks a determination that only Tennessee law should apply to the Blue Sky claims asserted by Plaintiffs. Utilizing a traditional conflict of laws analysis, Morgan Keegan claims Tennessee has the most significant relationship to the securities transactions at issue in this case and that its law should apply. Morgan Keegan asserts that Tennessee's relationship to the transactions precludes the application of the Oklahoma Securities Act.[2] The court concludes this case does not call for a traditional conflict of laws analysis, however. Instead, the

---

1. At the motion hearing, the court also addressed plaintiffs' motion to file a fourth amended complaint. The court granted the plaintiffs' motion and issued a written order on March 1, 2002. (Doc. # 172).

2. The parties raised, but did not pursue, a conflict of laws determination with regard to the common law claims asserted in this case. At the motion hearing, the parties represented to the court that the laws of the various jurisdictions which have an arguable connection to the case were substantially similar. Therefore, a conflict of laws determination was not required.

court finds persuasive those cases which hold that multiple states' Blue Sky laws can potentially apply to a single securities transaction.

■ In *Lintz v. Carey Manor Ltd.*, 613 F.Supp. 543, 550 (W.D.Va.1985), the court held that the potential application of more than one state's securities law to a single transaction did not create a conflict of laws problem:

> Just as the same act can violate both federal and state law simultaneously, or a state statute as well as a state common law, so too can it violate several Blue Sky laws simultaneously. There is nothing inconsistent in trying a securities case on multiple theories, and determining liability under each statute that is applicable, so long as the plaintiff is prevented from multiple recoveries.

*Lintz*, 613 F.Supp. at 551. Indeed, because more than one state can have an interest in regulating a single securities transaction, "[o]verlapping state securities laws do not present a classic conflict of laws question." *Simms Invest. Co. v. E.F. Hutton & Co. Inc.;* 699 F.Supp. 543, 545 (M.D.N.C.1988).

> Blue Sky laws protect two distinct public policies. First, the laws protect resident purchasers of securities, without regard to the origin of the security. Second, the laws protect legitimate resident issuers by exposing illegitimate resident issuers to liability, without regard to the

markets of the issuer. " 'The states' efforts to advance these interests will always overlap when securities transactions cross state lines. The states' interests can be protected without preventing other states from protecting their own interests.' "

*Simms Invest. Co.*, 699 F.Supp. at 545 (quoting Jack E. McClard, *The Applicability of Local Securities Acts to Multi–State Securities Transactions*, 20 U.Rich.L.Rev. 139, 141 (1985)). *See* Unif. Securities Act § 414 (amended 1958), Comment 3, 7C U.L.A. (2000) (suggesting that it is "quite possible for more than one statute to apply to a given transaction").[3] *See also Dillon Securities, Inc. v. Bartolini*, 944 F.2d 911, 1991 WL 184096, at *3 (10th Cir. Sept.18, 1991) ("The territoriality provisions of the [Uniform] Act define when the statute of a particular state applies to any given securities transaction, without regard to whether the statute of some other state might also apply");[4] *Chrysler Capital Corp. v. Century Power Corp.*, 1992 WL 163006, at *2 (S.D.N.Y. June 24, 1992) (rejecting an argument that only one state's law applied to a securities transaction "because application of multiple state securities laws to a single securities transaction does not present a conflict of laws issue").

■ Based on this and other authority, the court determines that multiple states' Blue Sky laws could potentially apply in this case.[5] Therefore, Morgan Keegan's

---

3. The "scope" section of the Oklahoma Securities Act is substantially similar to the scope section of the Uniform Securities Act. *See* 71 Okla.Stat. § 413.

4. *Dillon* is an unpublished opinion cited for persuasive value only under 10th Cir.R. 36.3(B).

5. Although not raised by the parties, the court notes in passing the existence of constitutional limitations on the reach of any state's Blue Sky law. A state's law may not be applied to a transaction "wholly outside" the state's

boundaries. To withstand Commerce Clause scrutiny, the transaction must have some in-state element and application of the state's law must further a legitimate state interest. *See Edgar v. MITE Corp.*, 457 U.S. 624, 640–42, 102 S.Ct. 2629, 2639–40, 73 L.Ed.2d 269 (1982); *A.S. Goldmen & Co., Inc. v. New Jersey Bureau of Securities*, 163 F.3d 780, 786 (3d Cir.1999). Here, the court assumes any conduct falling within the scope of the Oklahoma statute (i.e., a transaction which "originates from this state") has a sufficient nexus

argument that only Tennessee law applies to the transactions at issue is rejected by the court. Accordingly, to the extent Morgan Keegan's motion seeks a determination that only Tennessee law applies to the Blue Sky claims asserted by Plaintiffs, it is denied.

Having determined that the Blue Sky laws of multiple states could potentially apply to a transaction, it then becomes necessary to determine if the complaint states a basis for concluding the transactions here involved are within the scope of Oklahoma's Blue Sky law.[6] *See Simms Inv. Co.,* 699 F.Supp. at 546 ("the next step in the analysis is to determine whether the questioned transaction has a sufficient territorial nexus [with the state] so as to permit the application of its securities law"). *See also* Daniel A. Edelman, *Applicability of Illinois Consumer Fraud Act in Favor of Out–of–State Consumers,* 8 Loy. Consumer L.Rep. 27, *30 (1996) ("Where a statute prescribes its territorial applicability, common law decisions outlining choice of law principles do not apply, and the statutes on which the plaintiff relies must be examined to determine whether they apply to the transaction at issue.").

■ The Oklahoma Securities Act tracks the territoriality provisions of the Uniform Securities Act. *See* 71 Okla.Stat. § 413.[7] The Oklahoma Securities Act ex-

tends to "persons who sell or offer to sell when ... an offer to sell is made in this state ..." *See* 71 Okla.Stat. § 413(a)(1). An offer to sell is deemed to have been "made in this state" if, despite the absence of the parties from the state, the offer "originates from this state." *See* 71 Okla. Stat. § 413(c)(1).

■ The cases and other authorities provide little guidance as to what "originates" means in this context. It seems clear that a sale of securities does not "originate" in Oklahoma merely because the security was originally issued here. Some nexus between the "sale"—not merely the security—and the state is required.

Without attempting to determine precisely where the "originates" line is drawn, the court concludes plaintiffs have stated a claim sufficient, if ultimately established, to bring the sales involved in this case within the ambit of the Oklahoma Securities Act. The involvement of Morgan Keegan's employee in the preparation of some or all of the offering documents, his research and other activities in Oklahoma, the timing and circumstances of the offer, and other factors, provide a sufficient basis for concluding that plaintiffs may be able to establish a violation within the scope of the Oklahoma Securities Act.

to Oklahoma to withstand constitutional scrutiny.

6. Though denominated a "motion to determine applicable law," Morgan Keegan's motion is, in substance, a motion to dismiss the complaint insofar as it purports to state a claim based on the Oklahoma Securities Act.

7. Section 413 provides in pertinent part:
 (a) Sections 101, 201(a), 301, 404 and 408 of this title apply to persons who sell or offer to sell when:
 (1) an offer to sell is made in this state; or
 (2) an offer to buy is made and accepted in this state.

(b) Sections 101, 201(a), 404 and 408 of this title apply to persons who buy or offer to buy when:
(1) an offer to buy is made in this state; or
(2) an offer to sell is made and accepted in this state.
(c) For the purpose of this section, an offer to sell or to buy is made in this state, whether or not either party is then present in this state, when the offer:
(1) originates from this state; or
(2) is directed by the offeror to this state and received at the place to which it is directed (or at any post office in this state in the case of a mailed offer).

Based on these factors, the court finds that the plaintiffs have alleged a sufficient territorial nexus between the transactions at issue in this case and the State of Oklahoma. Thus, the Oklahoma Securities Act is applicable.

■ With respect to the parties' cross motions for summary judgment on the alleged status of Morgan Keegan as a statutory underwriter,[8] the court finds the existence of factual · issues which preclude summary judgment. These issues include, but are not limited to, the inferences to be drawn from Defendant T. Kenny & Company's use of a "syndicate" account to distribute the bonds to Morgan Keegan while using a trading account to distribute the bonds to all others, Morgan Keegan's purchase of over fifty percent of the issue from T. Kenny & Company, the economic realities of this transaction, and the nature and timing of Morgan Keegan's investigation into the issuance of the bonds. Further, there is a factual dispute as to whether the commission paid to Morgan Keegan was "excessive" within the meaning of the "broker-dealer" exception to the statutory definition of underwriter. *See* 71 Okla.Stat. § 2(y). Based on these factors, the court concludes summary judgment on the issue of defendant Morgan Keegan's alleged status as an underwriter is not warranted. *See* FedR.Civ.P. 56(c). *See also Ortiz v. Norton,* 254 F.3d 889, 893 (10th Cir.2001).

■ With regard to Morgan Keegan's motion for summary judgment on alleged misrepresentations, the court also finds that questions of fact exist which preclude

summary judgment, including the different inferences to be drawn from the research report issued by Morgan Keegan, the factual disputes regarding what Morgan Keegan's employee orally represented to the Plaintiffs and the dispute over what that employee actually knew or had reason to know after he conducted his investigation into the project. Based on these factual disputes, the court denies summary judgment on the issue of the alleged misrepresentations. *See* FedR.Civ.P. 56(c).

Accordingly, for the reasons stated herein, defendant Morgan Keegan's motion to determine applicable law was denied insofar as it sought to apply only Tennessee law to the transactions. The court further concluded that a sufficient nexus existed to apply the Oklahoma Securities Act in this case. In addition, for the reasons stated herein, the parties cross-motions for summary judgment on the alleged status of Morgan Keegan as a statutory underwriter and Morgan Keegan's motion for summary judgment on alleged misrepresentations were denied.

## ORDER ON RECONSIDERATION

Before the court are various issues, raised by motions of the parties, which the court has reserved or deferred ruling on. The court enters the following further orders:

■ (1) Defendant Morgan Keegan's motion to reconsider the court's decision regarding application of the Oklahoma Securities Act was denied, in substantial part, at the pretrial conference. The court retained for decision the issue of whether it should reconsider its decision as to appli-

---

8. An " '[u]nderwriter' means any person who has purchased from an issuer or from any other person with a view to, or offers or sells for an issuer or for any other person in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking. 'Underwriter' does not include a person whose interest is limited to a commission from an underwriter or broker-dealer not in excess of the usual and customary distributor's or seller's commission." 71 Okla.Stat. § 2(y).

cation of the Oklahoma Securities Act to plaintiff Strong's purchase, in June, 1998, of an additional $4.0 million of the bonds from Morgan Keegan. The court now concludes defendant's motion should be GRANTED and plaintiff Strong's claim dismissed insofar as it asserts a claim under the Oklahoma Securities Act for the $4.0 million in bonds. The undisputed facts show this sale was a sale in the secondary market, well outside the underwriting period as defined by either of the parties, and thus, under the facts of this case, not one which could be said to have "originate[d]" in Oklahoma within the meaning of the applicable statute. 71 Okla.Stat. § 413(c)(1). Plaintiff's claim under the Wisconsin statutes, applicable to the same $4.0 million purchase, remains.

 (2) Defendant Morgan Keegan has moved to exclude all testimony or other evidence relating to a prior bond deal in Tulsa, Oklahoma, involving some or all of the same entities as are involved here. The parties indicate the Tulsa project was unsuccessful financially and that the bonds involved there have also gone into default. Plaintiffs argue they should be allowed to point out the similarity of the research report issued by Morgan Keegan there to the one involved in this case, arguing that the similar or identical language of some portions of the reports suggest a lack of diligence on Mr. Conkling's part in preparing the report on the Oklahoma City project. Morgan Keegan objects on grounds of relevance and unfair prejudice, given Mr. Conkling's death and consequent non-availability to explain his actions. It presumably also prefers to avoid discussion of the financial default of the Tulsa project. The court concludes plaintiff should be allowed to offer evidence of the similar (or identical) aspects of the research report prepared by Mr. Conkling on the Tulsa

project and to argue that the similarities suggest he spent inadequate time preparing the Oklahoma City report. Similarly, defendants would be permitted to respond by noting the similarities of the two projects. However, plaintiff will *not* be allowed to introduce testimony as to the financial success, or lack thereof, of the Tulsa project and/or the default on those bonds, or to argue that Morgan Keegan has some historical tendency to involve itself in undercapitalized deals. The court concludes that while those facts may have arguable relevance to this case, their probative value is substantially outweighed by their tendency to confuse the issues and bog down this case in potentially extensive testimony and evidence on issues which are, at most, marginally related to the issues involved here. Fed.R.Evid. 403.[1]

 (3) The court concludes 15 Okla. Stat. § 235 has no application to plaintiffs' rescission claim under the Oklahoma Securities Act. Section 408 of Title 71 provides an explicit and relatively detailed scheme for determining the time frame within which claims must be asserted to be timely. If anything, the language of the statute implies some preference for longer, rather than shorter, limitations periods. 71 Okla.Stat. § 408(h). Further, section 408 is the most recent legislative expression on the limitations/timeliness issue. The provisions of the Oklahoma Securities Act prescribe the standards which apply in determining the timeliness of plaintiffs' claim. Evidence which depends for its admissibility on the applicability of section 235 will be excluded.

 (4) Plaintiffs seek to exclude any evidence relating to their post-purchase conduct as to the bonds, including any reference to valuations which they or others may have put on the bonds at vari-

---

1. The court rejects any suggestion that Mr. Conkling's death, in and of itself, makes it

unfairly prejudicial to defendant to introduce evidence as to what he did or did not do.

ous times in reports to shareholders or others, actions they have taken in connection with the bonds (forbearance agreements, use of bond funds), and the like. Plaintiffs argue such evidence is irrelevant to the issues and, potentially, an improper effort to impugn the character of plaintiffs. Defendants argue such evidence is relevant to issues of mitigation, ratification and credibility. Given the common law claim remaining,[2] the court concludes that at least some of the evidence plaintiffs seek to exclude may be properly admissible as bearing on issues of mitigation, ratification, or credibility,[3] and declines to preempt its admission by a motion in limine.

 (5) The court concludes "reliance" is not an element of plaintiffs' claim under either the Oklahoma or Wisconsin securities acts. *See MidAmerica. Fed. Sav. and Loan Assoc. v. Shearson/Am. Express Inc.*, 886 F.2d 1249, 1254 (10th Cir.1989) ("The face of section 408(a)(2) is clear in requiring that plaintiff show only lack of knowledge of a misleading statement or omission in order to prevail."); *Esser Distrib. Co., Inc. v. Steidl*, 149 Wis.2d 64, 437 N.W.2d 884, 886–87 (1989) (finding no reliance requirement under the Wisconsin Securities Act). A claimant under the Acts has no duty to investigate the accuracy of a seller's representations nor an obligation of due diligence. *MidAmerica Fed. Sav. and Loan Assoc.*, 886 F.2d at 1256. The level of financial sophistication of the purchaser/plaintiff is irrelevant to such statutory claims. *Id.* However, reliance is an element of the common law claim. *See Schulte v. Apache Corp.*, 949 P.2d 291, 296 (Okla.1995) ("Estoppel, con-

structive fraud, and negligent misrepresentation all require that a party rely to that party's detriment on the actions or words of the other party."); RESTATEMENT (SECOND) OF TORTS § 552 (1976) ("One who, in the course of his business, profession or employment ... supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information."). Evidence bearing on plaintiffs' claimed reliance on the alleged misrepresentations and the reasonableness thereof continues to be relevant to that claim. Evidence as to plaintiffs' level of financial sophistication properly bears on the issue of reasonable reliance in that context.

**2.** Plaintiffs have abandoned their common law fraud and fraudulent non-disclosure claims, but a claim for negligent misrepresentation remains.

**3.** Its use for "credibility" purposes is narrow. The court does not view such evidence (e.g. the value placed on the bonds by plaintiff in

various post-purchase contexts) as being appropriate to attack the "credibility" of the plaintiff corporations in general. To avoid being improper evidence of bad corporate "character" (Fed.R.Evid. 404), the evidence would have to have some reasonable relationship to the credibility of a particular witness who testifies.